1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   DONALD ANDERSON, et al.,                No.  2:12-cv-01057-MCE-DB

12              Plaintiffs,

13        v.                                 **ORDER ON DEFENDANT CENTURY
                                             SURETY COMPANY'S MOTION
14   NATIONWIDE MUTUAL INSURANCE             PURSUANT TO RULE 50(b)**
     COMPANY and CENTURY SURETY
15   COMPANY,

16              Defendants.

17

18                  **INTRODUCTION AND STANDARD OF REVIEW**

19        Following a five-day trial, the jury in this matter reached a verdict in Plaintiffs'

20   favor on October 24, 2017.  Defendant now asks that the jury's verdict, and the

21   subsequently entered judgment, be vacated.  The Court has read and considered

22   Defendant Century Surety Company's Motion for Judgment as a Matter of Law brought

23   pursuant to Federal Rules of Civil Procedure, Rule 50(b), as well as Plaintiffs' Opposition

24   to that Motion and the Reply thereto.  The standard of review employed by the Court in

25   deciding this Motion is whether the evidence, construed in the light most favorable to

26   Plaintiffs, allows only one reasonable conclusion and that conclusion is contrary to that

27   reached by the jury.  Acosta v. City &County of San Francisco, 83 F.3d 1143, 1145

28   (9th Cir. 1996).  If there is substantial evidence in favor of the jury's verdict, the Court

                                          1

must uphold that verdict, even if it is also possible to draw a contrary conclusion from the evidence.  Janes v. Wal-Mart Stores, Inc., 279 F.3d 883, 888 (9th Cir. 2002); Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).  "Substantial evidence is 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion.'" Mockler v. Multnomah County, 140 F.3d 808, 815, fn. 8 (9th Cir. 1998), quoting Murray v. Laborers Union Local No. 324, 55 F.3d 1445, 1452 (9th Cir. 1995).  The Court does not "make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).  With those standards in mind, the Court analyzes the issues raised and, as delineated below, finds that Defendants have not demonstrated that the verdict is improper.  Consequently, Defendants' Motion is DENIED.

**ANALYSIS**

There are five (5) separate issues raised by Century in support of its Motion for Judgment, namely: (1) Century did not breach its duty to defend its insured, Grant Park (Section A.1. of Defendant's Rule 50(b) Motion); (2) Century's failure to defend its insured, Grant Park, did not cause its insured any damage (Section A.2. of Defendant's Rule 50(b) Motion); (3) the underlying stipulated judgment was not on account of property damage actually covered by the Century insurance policies (Section B of Defendant's Rule 50(b) Motion); (4) the underlying stipulated judgment was not reasonable (Section C of Defendant's Rule 50(b) Motion); and (5) Century is not liable beyond its policy limits (Section D of Defendant's Rule 50(b) Motion).  The Court analyzes each contention in turn.

**A.     Did Century Surety Company Have A Duty To Defend Its Insured?**

Under California law, an insurer has a duty to defend whenever there is any possibility of coverage.  Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 275 (1966).  The determination of whether the duty to defend exists is not limited to consideration of the

2

complaint and the terms of the policy, as argued by Century. (Defendant's Rule 50(b) Motion, 2:4-6.) Century cited language from a case in support of its argument, but the very next sentence of that case states, in part, that ". . . extrinsic facts may also give rise to a duty to defend . . . ." <u>Baroco West, Inc. v. Scottsdale Insurance Company</u>, 110 Cal. App. 4th 96, 103 (2003). It has long been the law that, "[a]n insurer has a duty to defend an insured if it becomes aware of, or if the third-party lawsuit pleads, facts giving rise to the <u>potential for coverage</u> under the insuring agreement." <u>Century Surety Company v. Polisso</u>, 139 Cal. App. 4th 922, 941 (2006) (emphasis in original), citing <u>Waller v. Truck Insurance Exchange, Inc</u>., 11 Cal. 4th 1, 19 (1995). "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." <u>Horace Mann Ins. Co. v. Barbara B</u>., 4 Cal. 4th 1076, 1081 (1993). Century acknowledged during trial that it was obligated to consider "the information that is available to us at the time" (Daniel Mayer, 494:3-8) and "the information presented to us" (Daniel Mayer, 497:3-6), not just the policy and the pleadings.

The evidence in this case demonstrated that Century was actually aware of facts giving rise to the potential for coverage at the time it denied such coverage. As the undisputed evidence established at trial, Century initially denied the claims via two letters dated September 22, 2009 (Exhibit 15) and September 28, 2009 (Exhibit 16). Both letters stated: "Since the insured's work was completed on these sites before the policy period, there is no coverage for this loss." (Ex. 15, p. 4; Ex. 16, p. 4.)

In some insurance policies, there are exclusions for damages arising out of completed operations. But no such exclusion existed in the Century policies in this case (Exhibits 1 and 2), as established by the deposition testimony of Albert Wilson which was read to the jury. (Albert Wilson testimony, 41:23-46:22.) In other words, the initial denial was premised upon a policy provision which did not exist.

Immediately upon receiving the denial letters, David Ingram, an attorney representing the insured, sent a letter to Century advising that its denial was misplaced

and that it had "not fully analyzed the claims asserted in this action and, more troubling, ha[d] ignored information explicitly provided" to it.  (Ex. 17, p. 1.)  Mr. Ingram testified that this information included his initial tender letter dated June 29, 2009 (Ex. 3), along with a copy of the original Complaint (Ex. C-1 through C-14) and the Second Amended Complaint (Ex. 25).  In response to Century's request, Mr. Ingram had also sent another copy of the Second Amended Complaint, Plaintiffs' Estimated Cost of Repairs and Settlement Demand (Ex. 12), Mr. Lohse's report titled "Preliminary List of Problems with Repairs and Estimated Repair Costs" prepared on October 8, 2008 (Ex. 32), and Mr. Lohse's report titled "Preliminary List of Problems with Recommended Repairs and Estimated Repair Costs" prepared on February 24, 2009[1] (Ex. 33).  See Ex. 11; Testimony of Ingram, 305:1-308:14.  Mr. Ingram's October 5, 2009, letter (Ex. 17) included another copy of the Preliminary List of Problems (Ex. 18) and three photographs of the "offsite drainage system" that he took in the summer of 2008 (Ex. 19).

This information was more than enough to at least raise the possibility that the claims against the insured were covered.  The only other policy provisions Century relied on to disclaim coverage were what are colloquially referred to as the "deemer" clause and the "insured's own knowledge" clause.  The policies provided coverage for property damage which occurred during the policy period.  (Ex. 1, p. 21, and Ex. 2, p. 24.)  The policies also defined an "occurrence" to mean an accident, and stated that all property damage arising out of such an accident or series of related accidents was "deemed" to have taken place at the time of the first such property damage, even if the nature and extent of the damage changed; and even if the damage was continuous, progressive, cumulative, changing or evolving.  (Ex. 1, p. 13, and Ex. 2, p.16.)  Additionally, the policies provided that there was no coverage for property damage which was known to the insured prior to the inception of the policy.  (Ex. 1, p. 21, ¶¶ 1.b.3-1.c., and Ex. 2,

---

[1] The title page of this report is dated February 24, 2008, but Mr. Lohse testified that it was prepared in February 2009, as reflected in the header of every following page of the 63-page report.  (Norb Lohse, 448:21-449:1.)

1   p. 24, ¶¶ 1.b.3-1.c.)  Stated otherwise, the policies provided coverage only for new and

2   different damage caused by new and different occurrences which occurred for the first

3   time during the Century policy periods (in other words, after April 10, 2007 [Ex. 1, p. 3]).

4   　　　　It was <u>possible</u>, based on the allegations of the pleadings and the extrinsic facts

5   made known to Century Surety Company, that there were new and different damages

6   caused by new and different occurrences which took place for the first time after April 10,

7   2007.[23]  Century even conceded this point at trial:

8   　　　　Q:　　But it's also possible that if the complaint had been filed
    　　　　six months after the Century policy started, that there is a
9   　　　　potential for coverage, right?

10  　　　　A:　　It depends on what's in the complaint.  If it's complaining
    　　　　about something that

11

12  　　　　happened ten years ago, maybe not.

13  　　　　Q:　　What if it says within the last three years?

14  　　　　A:　　Well, that would beg the question of "when."

15  　　　　Q:　　But, again, there is a possibility in that instance,
    　　　　correct?

16  　　　　A:　　There is a possibility.  Depending on –

17  　　　　(Daniel Mayer, 496:10-19.)

18  　　　　Q:　　When was it [the Bent complaint] filed, Mr. Mayer?

19  　　　　A:　　Looks like October 2007.

20  　　　　Q:　　Which is six months after the Century policy incepted?

21  　　　　A:　　Correct.

22  ///

23  _____

24  　　　　[2] The Court notes that the insured's attorney, David Ingram, had this understanding and, in his
    own words, was trying "to make sure that Mr. Wilson understood that this wasn't just a straight
    construction defect case anymore, and that there were ongoing claims of new and – new damage,
25  additional damage, and ongoing events beyond the filing of the original complaint."  (David Ingram,
    323:21-25; 324:9-11 ". . . my carrier has no responsibility to pay for an occurrence that occurred after their
26  [sic] policy period, such as this flooding . . .".)

27  　　　　[3] Albert Wilson understood from his conversation with Mr. Ingram on October 5, 2009, that
    Mr. Ingram was telling him that there were occurrences that occurred for the first time within the Century
    Surety Company policy period and that those occurrences caused new and different damage which
28  occurred for the first time in the Century Surety Company policy periods.  (Albert Wilson, 88:11-18.)

5

1   (Daniel Mayer, 502:19-22.)  The Bent Complaint stated that the events had occurred

2   "throughout the last three years."  (Ex. C, p. 20, ¶ 23.)  Mr. Mayer's concession—that a

3   complaint alleging occurrences "within the last three years" which was filed six months

4   after the policy incepted would mean there was a possibility of coverage—is

5   determinative of this issue.

6       The law additionally provides that it is the insurer's obligation to prove that the

7   underlying claim could not possibly fall within the policy coverage; i.e., to prove that the

8   Second Amended Complaint could "by no conceivable theory raise a single issue which

9   could bring it within the policy coverage."  <u>Montrose Chemical Corp. of California v.</u>

10   <u>Superior Court (Canadian Universal Insurance Company, Inc.)</u>, 6 Cal. 4th 287, 295

11   (1993).  Stated otherwise, it was Century's obligation to prove that all of the damage was

12   (a) caused by events that occurred prior to April 10, 2007, or (b) was of the same nature

13   or extent as the damage that had occurred prior to April 10, 2007.  Century failed to do

14   so.

15       In this respect, Plaintiffs' expert Norb Lohse was physically present at the site and

16   witnessed the cause and the effect of the occurrences both before (Norb Lohse, 409:23-

17   25; 411:18-21; 412:8-9; 412:11; 413:2-5), during (Norb Lohse, 415:5-8; 416:8-9; 417:23-

18   25) and after (Norb Lohse, 442:9-10; 434:21-22) the January 2008 flood events.

19   Mr. Lohse testified that new and different damage than what had previously existed

20   occurred for the first time after January 2008:

21           Q:    Yes.  The Bent residence at 113 Meadow Lane.  Do you
                  identify in your observations new and different damages that
22                   was observed after the January 2008 drainage events?

23           A:    Yes.  My reports for all the homes in this case identified
                  my observations, that and my staff and other engineers, prior
24                   to 2008.  And then in the second portion of the observation
                  portion of the report identifies what we observed after the rain
25                   events of 2008.  So it's broken down prior to '08 and after.

26   (Norb Lohse, 463:23 - 464:6.)  Mr. Lohse also testified as to several examples of what

27   that new and different damage was.  (Norb Lohse, 458:9-10; 464:10-13; 464:22 - 465:2;

28   465:14-23.)

Mr. Lohse also testified that this new and different damage was caused by new and different occurrences for the first time after April 10, 2007: "The causes we saw in 2008 were different from the prior drainage causes." (Norb Lohse, 442:12-13.) The causes prior to 2008 were "partially because the park was still being developed . . . so that means you have a lot of construction debris" and partially from "drainage design problems that were corrected before 2008" or "poor design." (Norb Lohse, 442:16-20; 473:23-474:1; 473:20-22.) In contrast, the new and different damage which occurred for the first time during Century's policy period was caused by "the failure to maintain the drainage system so the water would freely flow into the retention pond" and "because the drainage wasn't maintained, kept free of debris." (Testimony of N. Lohse, 430:10-15; 434:18-20; 465:8-10, 442:16-23.) Mr. Lohse supported his testimony with his reports (Exs. 32 and 33) and his own photographs taken in early 2008 (Exs. 58, 63 and 66), along with the photographs taken by Mr. Ingram in the summer of 2008 (Ex. 19). Independent evidence also established that it was the underlying insured's responsibility to maintain those offsite drains. (Glen Van Dyke, 144:10-19; David Ingram, 334:4.)

Thus, the foregoing exhibits and testimony constitute evidence that the occurrences which pre-dated the Century policies were caused by improper design of the drainage system, while the occurrences after the inception of the Century Surety Company policies were caused by the negligence of the insured in failing to properly maintain off-site drainage, and not the same design issues which had been corrected prior thereto. (Testimony of Norb Lohse, 473:20-25.) These occurrences are plainly not "exposure to substantially the same general harmful conditions." (Ex. 1, p. 13, Ex. 2, p. 16.) They are patently different harmful conditions.

In other words, substantial evidence demonstrated new and different occurrences that happened for the first time within the Century policy period. Substantial evidence also demonstrated new and different harm as a result thereof. This evidence, viewed in the light most favorable to the non-moving party, constitutes substantial evidence sufficient to overcome Defendant's Rule 50(b) Motion to the extent it is premised upon a

1  contention of an evidentiary void.  As a matter of law, this evidence suffices to

2  demonstrate that there was at least a possibility of coverage and therefore that Century

3  Surety Company had a duty to defend its insured in the underlying lawsuit.

4  　　　Moreover, even if all that was available to Century were the pleadings and the

5  policies, the evidence entered by Plaintiffs demonstrated that was nonetheless sufficient

6  to trigger the duty to defend.  As set forth above, the policies provided coverage for

7  property damage which occurred during the policy period.  (Ex. 1, p. 21, and Ex. 2,

8  p. 24.)  Repeating from above, the policies also defined an "occurrence" to mean an

9  accident, and stated that all property damage arising out of such an accident or series of

10  related accidents was deemed to have taken place at the time of the first such property

11  damage, even if the nature and extent of the damage changed; and even if the damage

12  was continuous, progressive, cumulative, changing or evolving.  (Exhibit 1, p. 13, and

13  Exhibit 2, p.16.)  Stated otherwise, the policies provided coverage only for new and

14  different damage caused by new and different occurrences which occurred for the first

15  time during the Century policy periods (in other words, after April 10, 2007 [Exhibit 1,

16  p. 3]).

17  　　　Century contends that there could not have been any new and different damage

18  caused by a new and different occurrence after April 10, 2007, because the initial

19  complaint was filed before that date and the factual allegations were not amended

20  thereafter.  (Defendant's Rule 50(b) Motion, 2:16-19.)  Century Surety Company makes

21  the same contention with regard to its policy provision which states that there is no

22  coverage for property damage that was known to the insured.  (Exhibit 1, p. 13, and

23  Exhibit 2, p.16; Defendant's Rule 50(b) Motion, 2:20-26.)

24  　　　Century misapprehends the standard by which defense obligations are imposed

25  upon insurers in the foregoing regards.  The question is not whether the insurer may

26  utilize its own particular interpretation of the pleadings to reach a determination.  The

27  question is, as stated above, is there *any possibility* that the pleadings could be

28  interpreted to state facts showing coverage?  Gray, 65 Cal. 2d at 275.  As shown above,

8

there was at a minimum <u>the possibility</u> that there were new and different occurrences resulting in new and different damages after April 10, 2007—particularly given that Century was first notified of this claim over two years later in 2009.

Moreover, the timing of and the contents of the Second Amended Complaint required Century to provide a defense as a matter of law. Century received a copy of the Second Amended Complaint no later than 10:53 a.m. on July 6, 2009. (Ex. 25, p. 1.) Therein, it was pleaded that at some time during "the last three years" the property had not been properly maintained, such that it experienced "severe flooding" in the "common areas as well as Plaintiffs' individual spaces" and that this "caused damage to Plaintiffs' homes." (Ex. 4, 8:3-7.) This allegation covered the entirety of the Century policy periods. (Exhibits 1, 2.) And there were four (4) plaintiffs who were making these allegations for the very first time: the Bents, Grafs, Heeneys and Franzens. (Ex. 4, ¶¶ 36-39.) Evidence at trial showed that these four (4) sets of plaintiffs had filed a completely separate lawsuit on October 5, 2007, nearly six months after the Century Surety Company policies incepted. (Ex. C, p. 17.) In that separate lawsuit, they alleged that the damage to their homes had occurred "throughout the last three years." (Ex. C., pps. 20-21, ¶¶ 23-24.) In other words, as of that time, the allegation was that the damage had occurred at some as-yet ascertained point between July 6, 2006, and July 6, 2009. This necessarily included the <u>possibility</u> that the occurrences and the resulting damage had not begun until after April 10, 2007. Yet Century Surety Company did not investigate these facts—indeed, it did not know even at the time of trial how these individuals came to be parties to the underlying litigation. (Testimony of Daniel Mayer, 500:24-502:12.)

Century Surety Company likewise misapprehends the significance of Mr. Van Dyke's testimony to the effect that he did not amend Plaintiffs' pleadings to allege new and different occurrences. Mr. Van Dyke's testimony that the operative pleadings were sufficiently broad enough to encompass all of the conditions that ultimately constituted the property damage for which coverage was sought (Testimony of Glen Van Dyke,

9

128:2-18) was by no means an admission that the pleadings contained all of the insured's acts or omissions for which Plaintiffs were seeking relief. To the contrary, the breadth of the pleading was sufficient to require Century to provide a defense. (Testimony of Glen Van Dyke, 129:21-131:11.) At a minimum, Century was required to conduct a full, fair and thorough investigation in an effort to satisfy itself that there was no possibility of coverage. (Testimony of Albert Wilson, 97:3-6; Jury Instruction No. 14.) Such an investigation, had it been conducted, would have revealed that there was in fact a possibility of coverage.

In summary, whether considered alone or in conjunction with the extrinsic facts known to the insurer, there was at minimum a possibility of coverage which triggered Century's obligation to provide a defense to its insured. It was undisputed at trial that Century breached this duty when it denied coverage rather than provide a defense (which it could have done subject to a reservation of rights).

## B. The Entry Of A Judgment Is Sufficient To Constitute Harm.

The second ground upon which Century moves for relief is its contention that its insured suffered no harm as a result of the failure to provide a defense. Century cites Horace Mann Ins. Co, 61 Cal. App. 4th at 212, for the concept that the failure of one insurer to defend is of no consequence to an insured whose representation is provided by another insurer. (Defendant's Rule 50(b) Motion, 5:3-6.) Here, however, the evidence has shown that no insurer provided a defense to the insureds after March 22, 2010. (Ex. 26, p.1 [March 9, 2010, e-mail from defense counsel retained by Allied sent to Century Surety Company: "After the 22nd, Allied will no longer be providing the insureds a defense . . . placing the insureds in the position of being In Pro Per."]; Glen Van Dyke, 166:8-10.) Even if another insurer had provided a defense, that fact would have been immaterial to the issue of whether Century breached its obligation to defend. "It is immaterial that the actions were defended by the other insurer, the appellant having refused to defend." Lamb v. Belt Casualty Co., 3 Cal. App. 2d 624, 631 (1935).

///

1  Moreover, the evidence demonstrated that the insured did suffer harm.  The

2  testimony of Mr. Van Dyke revealed that the insureds' counsel, Mr. Daugherty, engaged

3  in extensive negotiations for over a year after he became counsel in or around

4  November 2010 to resolve the matter.  (Testimony of Van Dyke, 167:15-19; 168:4-13.)

5  In addition to Mr. Daugherty's fees, Grant Park Development and its counsel were well

6  aware that: ". . . the recording of the settlement [] would do every bit as much damage to

7  Grant Park Development as trying to enforce it."  (Ex. 94, p. 62.)  Mr. Van Dyke was not

8  willing to enter into the Stipulated Judgment unless it was against Grant Park

9  Development.  (Ex. 94, p. 45; Glen Van Dyke, 214:23-215:3; 218:2-4.)  This was a

10  critical negotiation point for Grant Park Development, as it contended using another

11  name on the Stipulated Judgment would protect Grant Park Development's "credit and

12  their existing bank loan."  (Ex. 94, p. 50; Glen Van Dyke, 215:4-216:2; 220:13-18;

13  228:23-229:1.)  Nonetheless, Grant Park Development ultimately conceded and allowed

14  the Judgment to be entered against it.  (Ex. 95, p.2.)

15  Even more fundamentally, the entry of a Stipulated Judgment in and of itself is

16  harm, irrespective of whether the Defendant faces financial exposure to that Stipulated

17  Judgment.  The reputational harm accompanying the stigma of a multi-million dollar

18  judgment, the fact that it is available to the public, and its impact on creditworthiness are

19  all factors that comprise this harm.  Consolidated American Insurance Company v. Mike

20  Soper Marine Services, 951 F.2d 186, 190-191 (9th Cir. 1991).  A judgment "could have

21  collateral adverse effects in several respects, including on [] future credit."  Id.  Moreover,

22  the defendant "may be unable to enter certain business transactions" as a result of

23  having a judgment entered.  Id.  Pleading for something other than a judgment against

24  Grant Park Development, its counsel wrote: ". . . they cannot sustain a judgment against

25  that entity.  It will put them out of business.  Their bank would shut them down."  (Ex. 94,

26  p. 39.)  The entry of the underlying Judgment itself constitutes substantial evidence of

27  harm sufficient to warrant denial of Defendant's Rule 50(b) Motion on this ground.

28  ///

**C.    In Bad Faith Failure To Defend Cases, Actual (As Opposed To Potential) Coverage Is Not At Issue.**

Century's third ground for relief is that there was no actual coverage for the property damage.  (Defendant's Rule 50(b) Motion, p. 7.)  But the controlling law in the Ninth Circuit is clear on this issue.  The insurer who wrongfully and unreasonably refuses to defend is automatically liable on the underlying judgment against the insured, even if the judgment against the insured would not have been covered under the policy:

> The general rule is long-settled in California that "an insurer that wrongfully refuses to defend is liable on the judgment against the insured." Gray v. Zurich Ins. Co., 65 Cal. 2d 263 . . . (Cal. 1966); see Samson v. Transamerica Ins. Co., 30 Cal. 3d 220 . . . (Cal. 1981); . . . Amato v. Mercury Casualty Co., 53 Cal. App. 4th 825 . . . (Cal. App. 1997).  The duty to defend is broader than the duty to indemnify, and extends to claims that are merely potentially covered.  Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287 . . . (Cal. 1993).  Where the wrongful refusal to defend is also unreasonable, it violates the covenant of good faith and fair dealing, and the insurer will be liable for consequential damages regardless of foreseeability.  Amato, 61 Cal. Rptr. 2d at 915; Campbell v. Superior Ct., 44 Cal. App. 4th 1308 . . . (Cal. App. 1996).

Pershing Park Villas Homeowners Association v. United Pacific Insurance Company, 219 F.3d 895, 901 (9th Cir. 2000).  "It is no defense that the ultimate judgment against the insured is not necessarily rendered on a theory within the coverage of the policy.  See Gray, 54 Cal. Rptr. 104, 419 P.2d at 179; Amato, 61 Cal. Rptr. 2d at 914." Id.

> Nor must the insured prove that the judgment would have been smaller, or would not have occurred, but for the insurer's wrongful failure to defend: "Such a theory . . . would impose upon the insured the impossible burden of proving the extent of the loss caused by the insurer's breach. Gray, 54 Cal. Rptr. 104, 419 P.2d at p. 179."
>
> The Gray rule of automatic liability applies equally to judgments entered by default. . . . Amato, 61 Cal. Rptr. 2d at 915.

Pershing Park, 219 F.3d at 901-902.

The Ninth Circuit expounded on the reason that it is the actual underlying Judgment, and not the damages upon which the underlying Judgment is predicated,

which is the dispositive consideration: "The insured is relieved of proving the extent of damages in a bad faith action in order to remove the insurer's incentive to strategically disavow responsibility for the insured's defense 'with everything to gain and nothing to lose.' Gray, 54 Cal. Rptr. 104, 419 P.2nd at 179." Pershing Park, 219 F.3d at 902.

The foregoing precedent is controlling. When an insurer denies its insured a defense, and does so in bad faith, it becomes automatically liable for all of the consequences of that decision, including but not limited to, the amount of the underlying judgment, regardless of foreseeability, and regardless of whether the theory of damages was actually covered by the policy. Gray, 65 Cal. 2d at 280; Amato, 53 Cal. App. 4th at 834; Pershing Park, 219 F.3d at 902.

The authorities relied upon by Century are inapposite. Specifically, Defendants understandably rely on a good deal of case law holding that noncovered claims are not recoverable, but those cases are not bad faith failure to defend cases.[4] Here, on the other hand, the failure to defend opens the insurer to liability if there was even the potential for coverage, and a finding of bad faith provided Plaintiffs with a basis to recover the amount of the underlying judgment, regardless of actual coverage.[5] For these reasons, the Court will follow the rule of the Ninth Circuit as expressed in Pershing Park, 219 F.3d 901, and Consolidated American Insurance Company, 951 F.2d 186, 191 ["Under these circumstances, California law requires the carrier to pay the full amount of the judgment . . ."]. Where, as here, there is at least a possibility of coverage, an

///

---

[4] For example, the bad faith finding in both DeWitt v. Monterey Insurance Company, 204 Cal. App. 4th 233 (2012) and Comunale v. Traders & General Insurance Co., 50 Cal. 2d 654 (1958), is premised on a failure to accept a reasonable settlement offer. And Pruyn v. Agricultural Ins. Co., 36 Cal. App. 4th 500 (1995) and Hogan v. Midland Nat'l Ins. Co., 3 Cal. 3d 553 (1970) do not deal with bad faith at all.

[5] Among the many cases, Defendants cite to ¶ 12:657 of the Rutter Group California Practice Guide, Insurance Litigation which provides that "[i]f noncovered claims were included in the third-party action, whatever part of the settlement is clearly allocable to those claims should not be recoverable against the insurer." But the case cited for this proposition, Hogan v. Midland Nat'l Ins. Co., 3 Cal. 3d 553, 565 (1970), is not a bad faith action. On the other hand, the same practice guide provides that "as long as there was potential coverage under the policy, the insurer's wrongful refusal to defend the insured may render it liable on a judgment for which there was no coverage. ¶ 12:681.

unreasonable failure to defend renders the insurer liable for extracontractual damages, including any judgment against the insured.

## D. Is There Substantial Evidence That The Stipulated Judgment Was Reasonable?

Century's moving papers contend that the underlying Judgment was not reasonable for two reasons: (1) there was no negotiation over the amount of the Judgment, and (2) there was significant "overreaching." (Defendant's Rule 50(b) Motion, 12:10-28.) Century refined its second argument in its Reply papers to clarify that it contends the underlying Judgment was not reasonable because it includes damages that Plaintiffs had no right to recover from their insured. (Defendant's Reply, 5:17-28.)

### 1. The evidence demonstrated negotiation of the amount of the stipulated judgment.

The Court questions whether an absence of negotiation over the amount of the Stipulated Judgment would demonstrate that it was unreasonable. However, the Court need not resolve that issue. The evidence demonstrated that there was negotiation over the amount of the Stipulated Judgment. (Glen Van Dyke, 249:25-250:12; 252:23-253:7; 254:16-20; Ex. 94, p. 34 [referring to right to recover attorneys' fees].) Mr. Van Dyke testified that he agreed to limit his attorneys' fees and <u>Stearman v. Centex Homes</u>, 78 Cal. App. 4th 611 (2000) costs as a part of the negotiated sum. (Glen Van Dyke, 253:12-18; 254:4-20; 257:9-17.) The foregoing constitutes substantial evidence sufficient to overcome Defendant's Rule 50(b) Motion on this point.

### 2. A stipulated judgment is not unreasonable because it arguably includes damages plaintiffs had no right to recover.

To the extent that the Stipulated Judgment states that it is for items that Plaintiffs could not have recovered from their landlord, the Court makes the following observations. First, once the underlying Judgment is entered, the Court does not review it to ascertain what it "covers." "A judgment is the final determination of the rights of the parties in an action or proceeding." Cal. Code of Civ. Pro. § 577. Second, in any

14

negotiated settlement, plaintiffs can often obtain consideration they would not have been able to recover via trial, and defendants may have to give up things they would not have otherwise been liable for if the matter proceeded to verdict. Third, there has been no showing of any reason that Plaintiffs could not have recovered damages for their loss of use of the common areas as a result of damage thereto, nor for their injuries resulting from the damage to the pads which they rented. Fourth, the fact that one Plaintiff in particular has since moved out of his home is no basis whatsoever for finding the settlement to be unreasonable. Fifth, and most importantly, the jury was presented with the Stipulated Judgment (Ex. 95) and its terms and the negotiation leading up to its entry (Ex. 94; see generally, Testimony of Glen Van Dyke), and the jury heard and considered the argument of counsel for Century that they should find the settlement to be unreasonable. Nonetheless, the jury expressly found that the settlement was reasonable. (Jury Verdict, Question 3.) The Court finds that the foregoing constitutes substantial evidence to support the jury's finding that the terms of the settlement entered into between Plaintiffs and Grant Park Development were reasonable.

### E. Is Century Liable Beyond Its Policy Limits?

The law in this area is clear. If an insurer who has in bad faith refused to provide a defense also refuses to accept a reasonable offer to settle within its limits, it is liable for the full amount of the judgment or settlement even in excess of the policy limits. Clark v. Bellefonte Insurance Company, 113 Cal. App. 3d 326, 335-36 (1980); Samson v. Transamerica Insurance Company, 30 Cal. 3d 220, 237 (1981); Comunale, 50 Cal. 2d 654. The timing of that offer—before or after a stipulated judgment is entered—is irrelevant to the determination of this issue. Consolidated Amer. Ins. Co., 951 F.2d at 190.

The evidence was uncontroverted that a settlement demand of $850,000.00 was made to Century in November of 2013. (Glen Van Dyke, 262:14-19; 263:19-24; 264:1-10; Daniel Mayer, 491:6-8.) This amount was unquestionably lower than Century's policy limit, whether one policy period or two policy periods were implicated. (Ex. 1, p.7,

Ex. 2, p. 10.)  Thus, the only question is whether there was substantial evidence to support the jury's finding that this settlement demand was reasonable.

The Court concludes that there was such substantial evidence.  Specifically, the amount of the Stipulated Judgment at that time was for more than $3.3 Million.  (Ex. 95.)  The amount of the demand was $850,000.00, (Glen Van Dyke, 262:18-19), which was well within the Century policy limits.  (Ex. 1, p. 7, Ex. 2, p. 10.)  Comparing these three figures reveals that the settlement demand was for less than one-quarter of Century's exposure at that time and was well within Century's policy limits even for a single year.  Additional evidence supports the jury's finding that the settlement demand was a reasonable one.  The timing of the settlement demand, having been made approximately four years before trial, supported the determination that it was a reasonable effort to resolve the litigation.  These factors, combined or singly, demonstrate that adequate evidence was presented to support the conclusion that the settlement demand was reasonable when made.  Century raises two arguments in support of its claim that there was no rejection of a "proper" settlement demand, presumably referring to the reasonableness thereof.  Neither is persuasive.

## 1. Century could not have recovered from its insured had it settled.

First, Century posits that it would be against the insured's interest for its insurer to accept a policy limits demand prior to a coverage determination, ostensibly on the basis that the insurer could seek to recoup that sum if it turned out the claim was not actually covered.  Century cites <u>Blue Ridge Ins. Co. v. Jacobsen</u>, 25 Cal. 4th 489 (2001) in support of this contention.  In <u>Blue Ridge</u>, the California Supreme Court answered a certified question from the Ninth Circuit: "Whether an insurer defending a personal injury suit under a reservation of rights may recover settlement payments made over the objection of the insured when it is later determined that the underlying claims are not covered under the policy."  <u>Blue Ridge</u>, 25 Cal. 4th at 492.

///

1    <u>Blue Ridge</u> has no application here.  Century was not an "insurer defending under

2    a reservation of rights."  Century denied coverage entirely.  The California Supreme

3    Court expressly held that there were three "prerequisites for seeking reimbursement for

4    noncovered claims included in a reasonable settlement payment: (1) a timely and

5    express reservation of rights; (2) an express notification to the insureds of the insurer's

6    intent to accept a proposed settlement offer; and (3) an express offer to the insureds that

7    they may assume their own defense when the insurer and insureds disagree whether to

8    accept the proposed settlement."  <u>Blue Ridge</u>, 25 Cal. 4th at 502.

9    Century did not satisfy <u>any</u> of these prerequisites.  It would not have been in a

10   position to seek reimbursement from its insured had it settled.  The argument that

11   Century had no duty to accept a settlement offer within the policy limits because the

12   insured had no remaining financial interest in the outcome in the circumstances

13   presented by the facts of this case has already been considered and expressly rejected

14   by the Ninth Circuit: "Under California law, [the insurer]'s act of rejecting [the] settlement

15   offer was a breach of its duty of good faith and fair dealing owed to [the insured].  [The

16   insurer] was thereafter obligated for the full amount of the judgment."  <u>Consolidated</u>

17   <u>American Ins. Co.</u>, 951 F.2d 186, 190.  The Ninth Circuit acknowledged the "peculiarity"

18   that the insured was not at risk to pay the judgment because of the covenant not to

19   execute (<u>id.</u>).  The Ninth Circuit held: "Consolidated wrongfully refused to defend Soper

20   and subsequently rejected a reasonable settlement offer within policy limits.  Under

21   these circumstances, California law requires the carrier to pay the full amount of the

22   judgment, including the amount in excess of policy limits."  (<u>Id.</u> at 191.)

23                      **2.      There is no rule requiring that a settlement demand must offer
                                  to extinguish the entire stipulated judgment.**
24

25   Second, Century contends that its insured would have still been the subject of a

26   judgment.  (Defendant's Rule 50(b) Motion, 13:24-26.)  The Court is not persuaded this

27   is the correct standard for determining whether a settlement demand is reasonable.

28   *///*

17

1  Defendant has cited no authority in support of such a rule, and the Court is aware of

2  none.

3         Moreover, the evidence on this point, viewed in the light most favorable to

4  Plaintiffs, was that if the offer had been accepted, the case would have been completely

5  resolved.  Acceptance of the offer ". . . from our point of view would allow the resolution

6  of the case at a number that our clients at the time could accept to avoid four more years

7  of litigation and going to trial."  (Glen Van Dyke, 264:7-10.)  In ruling on this motion, the

8  Court does not weigh potentially competing evidence.  (Daniel Mayer, 492:9-10 ["It only

9  offered to release Century.  There was no offer to release Grant Park or anyone else."].)

10  Nonetheless, the Court notes that Grant Park had already obtained a release.  It would

11  seem, therefore, that an offer to release Century should have quelled any concerns

12  Century may have had.  The foregoing evidence was, at best, evidence to be considered

13  by the jury in making its determination.

14         Given the existence of all the evidence bearing on the reasonableness of the

15  settlement demand, the Court cannot conclude that the evidence, construed in the light

16  most favorable to Plaintiffs, allows only one reasonable conclusion that is contrary to the

17  conclusion reached by the jury.  Accordingly, Defendant's Rule 50(b) Motion on this

18  ground is denied.

19

20                                    **CONCLUSION**

21

22         The Court finds that the legal issues raised by Century in its Rule 50(b) Motion do

23  not warrant ordering a new trial or directing the entry of judgment in favor of Century as a

24  matter of law.  The Court also finds there was substantial evidence to support the jury's

25  verdict and the ensuing Judgment as to each issue raised by Century in its Rule 50(b)

26  ///

27  ///

28  ///

1    Motion.  Accordingly, Century is not entitled as a matter of law to judgment in its favor in

2    contravention of the jury's verdict.  Century's Motion for Judgment as a Matter of Law is

3    therefore DENIED.

4            IT IS SO ORDERED.

5    Dated:  September 6, 2018

6

7                                                    MORRISON C. ENGLAND, JR.
                                                      UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28